117 T.C. No. 19

UNITED STATES TAX COURT

THE BOARD OF TRUSTEES OF THE SHEET METAL WORKERS'
NATIONAL PENSION FUND, IN ITS CAPACITY AS PLAN
ADMINISTRATOR, Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket No. 6157-00R.                    Filed December 4, 2001.

PP is a multiemployer pension plan established in
1966 to benefit employees in the sheet metal industry.
A second, separate fund (C) was established in 1985 to
provide 3-percent cost of living adjustments (COLAs) to
most of PP's participants.  For 1985 through 1990, C's
assets were insufficient to pay the 3-percent benefit,
and PP made "ad hoc" payments to each of its
participants who was eligible that year to receive a
benefit from C.  The ad hoc payment equaled the amount
that, in combination with the benefit payable from C,
equaled the 3-percent COLA.  PP's plan was amended in
March 1992 to add a COLA as of Jan. 1, 1991, equal to
the difference between the 3-percent COLA and the
portion of that amount paid by C.  In October 1992,
PP's plan was restated as of Jan. 1, 1991, to provide
for a flat 2-percent COLA that was not dependent on the
amount paid by C and that was payable to all eligible
employees without regard to whether the provision was

in effect when the employees retired or separated from service.  PP paid a COLA for 1992 through 1994.  In October 1995, PP's plan was amended to eliminate the COLAs paid under the plan to pre-1991 retirees.
     Held:  The 1995 amendment, although it removed COLAs that had been provided to pre-1991 retirees, did not violate the anticutback provision of sec. 411(d)(6), I.R.C.


Stephen M. Rosenblatt and W. Mark Smith, for petitioner.

Sandra M. Jefferson and Elizabeth S. Henn, for respondent.


OPINION


LARO, Judge:  Petitioner petitioned the Court for a declaratory judgment under section 7476.  The case is before the Court for decision on the basis of the stipulated administrative record.  Rule 217(b)(1).[1]

We must decide whether petitioner's pension plan, the Sheet Metal Workers' National Pension Fund, Plan A and Plan B (the Plan),[2] failed to qualify under section 401 for its plan year ended December 31, 1995, and thereafter.  We hold that it did qualify under section 401 and, hence, that its trust was exempt from Federal income taxation under section 501.

_____

[1] Rule references are to the Tax Court Rules of Practice and Procedure.  Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.

[2] Although the terms of Plan A and Plan B are set forth in two separate documents, those terms are substantially identical. We treat the plans as a single plan for purposes of this opinion.

## Background

The parties have stipulated the administrative record. That record is incorporated herein by this reference. Petitioner's address was in Alexandria, Virginia, when its petition was filed.

The Plan is a multiemployer defined benefit pension plan. It was established in 1966 by the Sheet Metal Workers' International Association (SMWIA) and by employers in the sheet metal industry. Its sponsor and administrator is petitioner. Petitioner, which comprises an equal number of employer and employee trustees, has the sole authority to amend the Plan.

The Plan primarily provides retirement benefits to employees in the sheet metal industry. Under the Plan, a participant is entitled to receive a pension ascertained from the Plan's terms in effect when he or she separates from covered employment. The amount of the pension is ascertained from the pension credit accrued and the contribution rates at which the participant had worked before separation.

In 1985, the SMWIA and the various employers who maintained the Plan established a separate fund (COLA Fund) to provide for cost of living adjustments (COLAs). The COLA Fund was not part of the Plan, and the COLA Fund and the Plan had separate trusts, were governed by separate plan documents, and had separate boards of trustees. The COLA Fund's plan document gave the trustees the discretion to ascertain each year whether a COLA would be paid

and, if so, the amount of the payment not to exceed the amount of available assets. It was always intended that the annual benefit under the COLA Fund would equal approximately 3 percent of the pensioner's annual retirement benefit from the Plan, multiplied by the number of years, up to 15, that he or she had received a pension from the Plan (the 3-percent COLA).

The COLA Fund was set up as a supplemental payment plan under the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, sec. 3(2)(B)(ii), 88 Stat. 829, (currently codified at 29 U.S.C. sec. 1002(B) (ii) (1994)), as amended by the Multi Employer Pension Act of 1980, Pub. L. 96-364, sec. 409, 94 Stat. 1307. The employers who maintained the COLA Fund initially contributed to the fund 5 cents per every hour worked by an employee of theirs. Each employer who maintained the COLA Fund also maintained the fund (NPF Fund) underlying the Plan, but not all employers who maintained the NPF Fund also maintained the COLA Fund. Thus, not all Plan participants participated in the COLA Fund.

In 1985, the COLA Fund's assets were insufficient to pay the full 3-percent COLA. Accordingly, the NPF Fund made an "ad hoc" payment to each retiree and beneficiary under the Plan who was eligible that year to receive a benefit from the COLA Fund. (The minutes of the meeting authorizing the ad hoc payment in 1985, like those for subsequent years, contained the recital: "Noting

that it was permissible for a pension fund to provide ad hoc

benefit increases to pensioners and beneficiaries it was agreed

that the National Pension Fund should provide the amount

necessary to reach the desired formula.")  The ad hoc payment

equaled the amount that, in combination with the benefit payable

from the COLA Fund, equaled the 3-percent COLA.

The COLA Fund's assets were again insufficient to pay the

3-percent COLA for 1986, 1987, and 1988.  In each of these years,

petitioner approved the NPF Fund's payment of an ad hoc amount

that, in combination with the benefit payable under the COLA

Fund, equaled the 3-percent COLA.  The percentages of those ad

hoc payments for 1985 through 1988 were 1.7, 1.8, 1.5, and 2.4,

respectively.

On July 11, 1988, respondent prescribed a new set of

regulations that included section 1.411(d)-4, Q&A-1(c), Income

Tax Regs.  That section mandates that, if an employer establishes

a pattern of repeated plan amendments providing for similar

benefits in similar situations for substantially consecutive,

limited periods of time, those benefits will be treated as

provided under the terms of the plan.  That section further

mandates that patterns of repeated plan amendments adopted and

effective before July 11, 1988, are disregarded in determining

whether the amendments constitute a pattern that is deemed part

of the plan.  Petitioner's minutes of its meeting in October 1988
recite that its legal counsel reported that

> recent Internal Revenue Service regulations which
> provide that a pattern of repeated plan amendments
> providing for similar benefits, in similar situations
> paid to participants for substantially consecutive
> limited periods of time will be considered by the
> Internal Revenue Service as a permanent benefit and the
> Internal Revenue Service would require that such
> benefits be funded.  [Counsel] * * * stated that the
> regulations make a presumption that any such benefit
> paid for three consecutive years will be considered a
> permanent benefit.

In 1989, the employers' contribution to the COLA Fund was
raised from 5 to 10 cents per hour worked.  The COLA Fund's
assets were again insufficient to pay the 3-percent COLA for 1989
and 1990.  To make up for the shortfall, petitioner authorized ad
hoc payments from the NPF Fund of 2.3 percent and 2.1 percent for
the respective years.

In a session held on November 15 and 16, 1990, petitioner
agreed to amend the Plan to provide a 2-percent annual
cost-of-living benefit (the NPF COLA) as an integral part of the
Plan itself beginning in December 1991.  A March 1991 newsletter
sent to plan participants stated in an article entitled "NOW!
COLA COVERAGE FOR ALL NPF RETIREES":

> The Trustees of the Sheet Metal National Pension Fund
> have unanimously voted to extend COLA (Cost of Living
> Allowance) protection to all qualified retired SMWIA
> members and their surviving spouses who receive NPF
> pensions.

As a result, in October 1991, the original COLA Fund was amended to provide for a 1-percent cost-of-living benefit.  In December 1991, the COLA Fund paid .96 percent as a COLA benefit, and the NPF Fund paid 2.04 percent.

In March 1992, petitioner adopted a new article 8 that formally added the NPF COLA to the Plan, effective retroactively to January 1, 1991.  Initially, the March 1992 amendment provided that the NPF COLA would equal the difference between 3 percent and the amount paid from the COLA Fund.  In October 1992, the Plan was restated retroactively to January 1, 1991, to provide for a 2-percent benefit (subject to minor adjustments) that was not dependent on the amount paid from the COLA Fund; it was anticipated that the COLA Fund would pay a 1-percent benefit if it had sufficient assets.  The new article 8 provided NPF COLAs to all eligible employees without regard to whether the NPF COLA provision was in effect when the eligible employee retired or separated from service.  Thus, plan participants who retired or separated from service before January 1, 1991 (pre-1991 retirees), were provided with the NPF COLAs.

Pursuant to the Plan's amendments, the NPF Fund paid for the respective years from 1992 through 1994 a COLA of 2 percent, 2.2 percent, and 2 percent, multiplied by the number of years (up to 15) that the pensioner had received a pension from the Plan.  NPF

COLA payments were made in lump sum distributions in December in the form of a "13th check".

By the end of 1993, petitioner concluded that the COLA Fund could no longer provide the anticipated 1-percent payment. In a letter dated December 1993, which enclosed the 13th check, eligible retirees and beneficiaries were informed that future COLA checks would be based on a 2- rather than 3-percent rate. As of 1994, the COLA Fund stopped paying COLAs. In September 1994, the COLA Fund's trustee voted to end employer contributions to the COLA Fund, effective July 1, 1995. In December 1994, petitioner adopted an amended and restated plan that included minor amendments to article 8, none of which are relevant herein. In March 1995, petitioner proposed an amendment to article 8 which would eliminate the NPF COLAs paid to pre-1991 retirees.

Later in March 1995, the Plan filed a Form 5303, Application for Determination for Collectively Bargained Plan, with respondent's Baltimore Key District Office (District Office). The application was filed in response to a technical advice memorandum dated November 9, 1994 (regarding provisions not at issue in this case), as well as to comply with amendments to the Code. The application contained the amended and restated plan that petitioner adopted on December 22, 1994. It also contained a copy of a proposed amendment to article 8 which would eliminate NPF COLAs for pre-1991 retirees.

On October 30, 1995, petitioner amended and restated article 8 (1995 article 8).  The 1995 article 8 provides that, effective January 1, 1995, a participant had to have separated from covered employment on or after January 1, 1991, in order to be eligible to receive an NPF COLA.  The 1995 article 8 also provides that petitioner may amend the Plan in any year to provide an ad hoc payment to pre-1991 retirees.  The 1995 article 8 limits the amount of any single year's ad hoc payment to 5 percent of the retiree's annual pension benefit and does not take into account years of service.

By unanimous written concurrence on December 30, 1996, petitioner amended and restated article 8 (1996 article 8), again providing that a plan participant had to be separated from covered employment on or after January 1, 1991, to receive an NPF COLA.  The 1996 article 8 also incorporates specifically the provision permitting the Plan to be amended so that ad hoc payments might be made to pre-1991 retirees in 1995 and again in 1996.  For 1996, petitioner paid a flat 8-percent ad hoc payment to the pre-1991 retirees.

On April 30, 1997, petitioner submitted the final adopted article 8 to the District Office as a supplement to the application for determination.  By letter dated June 12, 1997, the District Office notified the Plan that it was requesting a technical advice memorandum (TAM) from respondent's national

office on the answers to the following questions: (1) Whether the benefit provided under article 8 is an accrued benefit under section 411(a)(7)(A)(i) for pre-1991 retirees; and (2) whether the amendment that discontinued NPF COLAs for pre-1991 retirees reduced those participants' accrued benefits in violation of section 411(d)(6)(A).

By letter dated September 8, 1999, the District Office sent a copy of the TAM to the Plan's counsel. The TAM concludes that the amendment to article 8 violates section 411(d)(6). The letter asked the Plan to submit a corrective amendment. By letter dated October 4, 1999, the Plan's counsel notified the District Office that petitioner did not intend to make any corrective amendment to the Plan.

On March 6, 2000, respondent issued to the Plan a final adverse determination letter that stated that the Plan failed to qualify under section 401(a) for 1995 and thereafter. It also stated that the trust underlying the Plan was not exempt from Federal income taxation under section 501(a) for the related years. The adverse determination was generally based upon the reasons stated in the TAM.

## Discussion

We must decide whether the NPF COLA is an accrued benefit of the pre-1991 retirees, the elimination of which violated the anticutback rule of section 411(d)(6). Petitioner maintains that

the NPF COLA is not an accrued benefit as to pre-1991 retirees because the NPF COLA only became effective on January 1, 1991. Petitioner concludes that the pre-1991 retirees could not have accrued an NPF COLA while they were employees and, hence, that the 1995 amendment eliminating that benefit as to them did not violate section 411(d)(6). Respondent argues that the NPF COLA is an accrued benefit as to pre-1991 retirees and that its elimination violates the anticutback rule. Respondent contends that the level of benefits provided by a plan is set by the parties thereto in the plan's terms and that nothing in ERISA prevents a plan from being amended after a participant's retirement to provide, retroactively, more generous accrued benefits to that participant.

We agree with petitioner. For the reasons stated below, we believe that a COLA that is added to a plan after the retirement of some of its participants, although made available to them, is not an accrued benefit as to those participants under section 411(d)(6).

Congress enacted ERISA to ensure that "if a worker has been promised a defined pension benefit upon retirement--and if he has fulfilled whatever conditions are required to obtain a vested benefit--he actually will receive it." Nachman Corp. v. Pension Ben. Guar. Corporation, 446 U.S. 359, 375 (1980). Congress included in Title I of ERISA provisions for the "Protection of

Employee Benefit Rights". Congress included in Title II of ERISA "Amendments to the Internal Revenue Code Relating to Retirement Plans." Through ERISA, qualified pension plans and their participants are granted favorable tax treatment in that: (1) An employer may deduct its contributions to the trust which holds the pension fund in the year in which the contributions are made, (2) the earnings on the trust's principal are not taxed, and (3) the employee is not taxed until the benefits are distributed to him or her.

We concern ourselves with the anticutback rule of section 411(d)(6). That section, which parallels the requirements of 29 U.S.C. sec. 1054(g), provides in relevant part:

> (6) Accrued benefit not to be decreased by amendment.--

>> (A) In general.--A plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan, other than an amendment described in Section 412(c)(8), or Section 4281 of the Employee Retirement Income Security Act of 1974.

>> (B) Treatment of certain plan amendments.--For purposes of subparagraph (A), a plan amendment which has the effect of--

>>> (i) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations)[3], or

---

[3] There is no definition of "retirement-type subsidy" in the regulations.

        (ii) eliminating an optional form of benefit,

        with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.  In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.  The Secretary may by regulations provide that this subparagraph shall not apply to a plan amendment described in clause (ii) (other than a plan amendment having an effect described in clause (i)).

For this purpose, the term "accrued benefit" is defined by section 411(a)(7) as follows:

    (7) Accrued benefit.--

        (A) In general.--  For purposes of this section, the term "accrued benefit" means--

            (i) in the case of a defined benefit plan, the employee's accrued benefit determined under the plan and, except as provided in subsection (c)(3), expressed in the form of an annual benefit commencing at normal retirement age * * *

An accrued benefit generally represents the progressively increasing interest in a retirement benefit that an employee earns each year, under a formula that is provided in the plan. Ashenbaugh v. Crucible, Inc., 1975 Salaried Ret. Plan, 854 F.2d 1516, 1524 (3d Cir. 1988); see Hoover v. Cumberland, MD Area Teamsters Pension Fund, 756 F.2d 977, 981-982 (3d Cir. 1985).

    ERISA does not specify any particular amount of an accrued benefit.  It does, however, generally require that a qualified

pension plan participant's right to his or her normal retirement benefit must become fully vested within specified time limits. Sec. 411(a); see also 29 U.S.C. sec. 1053(a). When an employee's accrued retirement benefit is vested, it is nonforfeitable. Thus, a participant in a defined benefit plan (such as the Plan) is fully vested when he or she has a nonforfeitable right to 100 percent of the accrued benefit. An employee's accrued benefit at any given time is what a fully vested employee would be entitled to receive under the plan's formula if the employee ceased employment at that time. In order to prevent circumvention of the vesting provisions, the anticutback rule provides that, in order to remain qualified, a plan must not decrease an accrued benefit or reduce a retirement-type subsidy.

The statutory language defining "accrued benefit" for purposes of the Code supports our conclusion that the NPF COLA is not an "accrued benefit" as to pre-1991 retirees. Section 411(a)(7) defines "accrued benefit" as "the employee's accrued benefit determined under the plan and, except as provided in subsection (c)(3), [which is not relevant here] expressed in the form of an annual benefit commencing at normal retirement age". (Emphasis added.) Section 411(d)(6), by contrast, protects the "accrued benefit of a participant" from being "decreased by an amendment of the plan". (Emphasis added.) The statutory construction thus indicates that a retirement benefit may be

"accrued" only by an "employee", but, once accrued, the benefit is protected from diminution as long as the individual who accrued the benefit is a "participant" in the plan, whether as an employee or as a retiree.[4]  It follows that, while a retiree may enjoy COLAs added after retirement, such COLAs are not "accrued benefits" as to that retiree, because the COLAs were not accrued while he was an employee.  Accordingly, the later-added COLAs are not protected from being diminished by operation of section 411(d)(6).

The pertinent legislative history reinforces the understanding that ERISA was meant to protect only retirement benefits "stockpiled" during an employee's tenure on the job:

> Unless an employee's rights to his accrued pension benefits are nonforfeitable, he has no assurance that he will ultimately receive a pension.  Thus, pension rights which have slowly been stockpiled over many years may suddenly be lost if the employee leaves or loses his job prior to retirement.  Quite apart from the resulting hardships * * * such losses of pension rights are inequitable, since the pension contributions previously made on behalf of the employee may have been made in lieu of additional compensation or some other

---

[4] While 29 U.S.C. sec. 1002(6) (1994) defines "employee" as "any individual employed by an employer", 29 U.S.C. sec. 1002(7) (1994) defines "participant" more expansively to include "any employee or former employee".  (Emphasis added.)  The terms "employee" and "former employee" are not interchangeable. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117-118 (1989).  Additionally, while the definition of the term "accrued benefit" under 29 U.S.C. sec. 1002 (23) is "an individual's accrued benefit", we find no indication that this term has a different meaning for purposes of sec. 411(d)(6).

benefits which he would have received.  [S. Rept.
93-383, at 45 (1974), 1974-3 C.B. (Supp.) 80, 124.[5]]

There appears to be only one case that has addressed the
issue of whether a retirement supplement is an accrued benefit
for participants who retired before the supplement was added to a
plan.  The case of Scardelletti v. Bobo, 1997 U.S. Dist. LEXIS
14498 (D. Md. Sept. 8, 1997), addressed the Transportation
Communication International Union (TCU) Staff Retirement Plan
(TCU plan).  In 1991, the TCU plan's former trustees recommended
an automatic COLA on the basis of the advice of the plan's former
actuary.  By 1993, a new actuary had concluded that the former
actuary's calculations were erroneous and that the plan could not
afford an automatic COLA.  The TCU Executive Council froze the
automatic COLA for future service accruals for active employees,
and the TCU plan's current trustees sued the former trustees
under ERISA for breach of fiduciary duty.  The current trustees
alleged that, by following the earlier actuary's advice, the
former trustees had significantly increased the plan's funding
requirements.  The former trustees defended by arguing that the

---

[5] Other portions of the legislative history are not
particularly helpful in this case.  They describe accrued
benefits in terms of what they are not:  "In the case of a
defined benefit plan * * *  The term "accrued benefit" refers to
pension or retirement benefits and is not intended to apply to
certain ancillary benefits, such as medical insurance or life
insurance".  H. Rept. 93-807, at 60 (1974), 1974-3 C.B. 236, 295.
The parties agree that the NPF COLA is a retirement benefit and
not an ancillary benefit.

current trustees could have mitigated plan losses by eliminating the automatic COLA for participants who retired before its effective date in 1991.

In its opinion, the District Court explained the purpose of section 411(d)(6) by observing that "if an employee works with the expectation that she is earning, and will receive, a pension benefit, an employer may not later decide not to give her the benefit that it has promised and she has earned." Id. Citing Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 511 (1981), the District Court noted that "The purpose of the requirement [in section 411(d)(6)] is to protect that which an employee has been promised and has earned over time." Scardelletti v. Bobo, supra. The court explained that "The question in our case is purely whether a later-added benefit may be considered an accrued benefit." Id. at n.7. The court concluded that the COLA "was not an accrued benefit" as to participants who retired before the COLA was adopted in 1991, because those participants "did not work with the expectation that they would receive a COLA." Id.

Other courts have stressed the principle that an accrued benefit is one that is promised to the employee, accrued by the employee during his or her tenure as an employee, and expected by the employee to be available upon retirement. In Hickey v. Chicago Truck Drivers Union, 980 F.2d 465 (7th Cir. 1992), for example, a union's defined benefit pension plan was amended to

add a COLA to all retirement benefits.  In 1987, the plan was terminated without provision for the funding of future COLAs.  Ms. Hickey and other plan participants brought an action to preserve the COLA.  They contended that the COLA was part of their monthly accrued retirement benefit and could not be eliminated without violating 29 U.S.C. sec. 1054(g), the equivalent provision to section 411(d)(6).  The Court of Appeals for the Seventh Circuit agreed with Ms. Hickey, finding that the COLA benefit could not be reduced by amendment.  The Court of Appeals observed that

> A participant's right to have his basic benefit adjusted for changes in the cost-of-living accrued each year along with the right to the basic benefit.  A participant's entitlement to his or her normal retirement benefit included, as one component, the right to have the benefits adjusted pursuant to the COLA provision.  [Id. at 469.]

Similarly, in Shaw v. Intl. Association of Machinists & Aerospace Workers Pension Plan, 750 F.2d 1458 (9th Cir. 1985), the plan included a "living pension" feature.  The living pension was analogous to a COLA benefit, because it provided for adjustment of the benefit after retirement by substituting in the benefit formula the current monthly salary of the retiree's old job in place of the retiree's final monthly salary.  The plan in Shaw was amended in 1976 to decrease the living pension feature and suit was brought by a participant who had retired in 1975.  Id. at 1460.  The court in Shaw emphasized that the entire

pension benefit--including the living pension feature--was "promised, anticipated and accrued." Id. at 1466. It explained:

> Congress determined "that despite the enormous growth in * * * [pension] plans many employees with long years of employment are losing <u>anticipated retirement benefits</u> owing to the lack of vesting provisions in such plans." 29 U.S.C. § 1001(a). The Supreme Court has held, "Congress through ERISA wanted to ensure that 'if a worker has been <u>promised a defined pension benefit</u> upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit –  * * * he actually receives it.'" [Citations omitted.] Thus, the material available for interpreting ERISA's definition of "accrual" always refers to the terms of the pension plan itself. It is those terms that raise the anticipa[tion of] of retirement benefits that Congress sought to protect and the "promised * * * defined pension benefit" that the Supreme Court has sought to protect. [<u>Id.</u> at 1465-1466.]

The courts in <u>Hickey</u> and <u>Shaw</u> ruled that the COLA adjustment and the living pension feature, respectively, formed part of the participants' accrued benefit and could not be eliminated. In so holding, both courts reasoned that the benefit supplement involved had been promised to and relied on by affected employees while they were employed. Respondent points out, however, that neither court made a distinction between those retirees who had left employment before the retirement benefit was adopted and those who retired after the COLA was adopted. (In <u>Hickey</u>, the COLA was adopted in 1973, and terminated in 1987. In <u>Shaw</u>, no mention is made of when the "living pension" provision was

adopted, although it was eliminated in 1976.[6])  Respondent submits that this Court should adopt the rationale of Hickey v. Chicago Truck Drivers Union, supra, and decline to distinguish between the case of participants who retire before a COLA is adopted and those who retire afterwards.  Respondent cites language in Hickey to the effect that--

> viewing the Plan as a whole, the COLA is an essential element of the normal retirement benefit.  The COLA ensures that the retirement benefits will not diminish in real value over time.  It provides the additional retirement income each month that is necessary to maintain the value of the retirement benefits.  [Id. at 468.]

Respondent's argument would have some force if the opinion in Hickey had made an affirmative holding that the COLA was an accrued benefit for pre-1974 retirees.  It did not.  We instead accept the conclusion of the court in Scardelletti v. Bobo, supra, which found Hickey to be distinguishable.  In the case before it, the court in Scardelletti observed that "Here, beneficiaries who retired before 1991 did not accrue any COLA benefit."  Id.  The court stated:

> Although * * * the Hickey court did not distinguish between pre-1973 and post-1973 retirees, it does not necessarily follow that that distinction is irrelevant for determining whether the benefits were

---

[6] In Shaw v. Intl. Association of Machinists & Aerospace Workers Pension Plan, 563 F. Supp. 653, 655 (C.D. Cal. 1983), the District Court's opinion is silent on this fact as well, although it does quote from a description of the "living trust" dated 1969, some 6 years before the plaintiff retired and some 7 years before the "living pension" was terminated.

accrued. It is most likely that there were few pre-1973 retirees still receiving benefits under that plan, and that the issue was not even raised in that case. There is certainly no indication from the court's opinion that it was raised by the parties. [Id.]

We conclude that the provisions of ERISA are meant to preserve only those retirement benefits accrued by an employee during his tenure as an employee. This conclusion follows from the language of section 411(a)(7) that defines an accrued benefit as one of an "employee" "commencing at normal retirement age". The same conclusion follows from the legislative history emphasizing ERISA protection of pension rights which have been "slowly stockpiled" and from the cases which maintain that ERISA benefits were those which were "promised, anticipated, and accrued."

Respondent argues, in the alternative, that "if the NPF COLA benefit is not considered to be an accrued benefit, it appears to fit within the definition of a retirement-type subsidy" within the meaning of section 411(d)(6)(B)(i).[7] We disagree. The concept of a retirement-type subsidy has an accepted meaning as it is used in section 411(d)(6)(B)(i). It does not refer to postretirement COLAs. It refers to amounts paid to early retirees above their normal pension benefits.

---

[7] Petitioner maintains that respondent's alternate arguments were not made in a timely fashion and that respondent thus bears the burden of proof as to these arguments under Rule 217. In view of our disposition of these issues, we need not decide where the burden of proof lies.

Pension plans frequently provide for early retirement benefits. Such early retirements often commence at age 55 and require the fulfilment of a minimum period of service. The value of the early retirement benefit is calculated by first determining the amount that would be payable to the participant at normal retirement age, given the participant's service and compensation as of the date of early retirement. This value is then reduced by a factor reflecting that benefit payments will begin earlier than was contemplated and, therefore, are likely to continue for a longer period of time. Often, however, early-retiring employees are provided benefits which are not so reduced. "The provision of an early retirement benefit greater than the actuarial equivalent of the normal retirement benefit is referred to as a subsidized early retirement." Bellas v. CBS, Inc., 221 F.3d 517, 525 (3d Cir. 2000) (citing McGill & Grubbs, Fundamental of Private Pensions 131-135 (6th ed. 1989)); see, e.g., Rybarczyk v. TWR, Inc., 235 F.3d 975, 978 (6th Cir. 2000) ("The benefit received by early retirees was called, in the jargon of the cognoscenti, a 'subsidized' benefit.").[8]

---

[8] See also Dade v. N. Am. Phillips Corp., 68 F.3d 1558, 1562 n.1 (3d Cir. 1995) (citing Bruce, Pension Claims Rights and Obligations 285 (1993)) (benefits paid under an early retirement program, in light of sec. 411(d)(6)(B)(i), "are considered early retirement subsidies because 'more is provided * * * than any reasonable actuarial equivalent of the plan's normal retirement benefits.'"); Ashenbaugh v. Crucible, Inc., Ret., 854 F.2d 1516, 1521 n.6, 1528 n.12 (3d Cir. 1988) (benefits to an employee

(continued...)

Section 411(d)(6)(B)(i) was added to the Code in 1984, as part of the Retirement Equity Act (REA), Pub. L. 98-397, 98 Stat. 1426 (1984). Before the REA, the anticutback rules did not explicitly preclude plan amendments that reduced or eliminated early retirement benefits or retirement-type subsidies. Because many early retirement programs provided a benefit commencing before normal retirement age, such a benefit was found not to fall within the definition of an "accrued benefit". Bellas v. CBS, Inc., supra at 523 n.2. The REA provided that an employee would be protected from a plan amendment reducing his or her early retirement benefit or retirement-type subsidy.[9] It did not, however, affect the type of COLAs that are at issue here.

Moreover, even if we assume for the sake of argument that the NPF COLAs were "retirement-type subsidies", they would not be nonforfeitable under section 411(d)(6)(B)(i) as to those who retired before the NPF COLA amendments became effective. By treating retirement subsidies as if they were accrued benefits, the REA broadens the scope of benefits protected under the

---

[8](...continued)
retiring before normal retirement age "still have value in excess of the amount that would be available to a retiring employee under the comparable actuarially-reduced normal retirement benefit provisions. We agree * * * that this excess value is a subsidy.").

[9] Congress contemplated that the Treasury Department would promulgate regulations defining the term "retirement-type subsidy". See sec. 411(d)(6)(B)(ii); see also 29 U.S.C. sec. 1054(g)(2)(A). The Treasury Department has yet to do so.

anticutback rule. It does not, however, expand the category of persons who may accrue such benefits. Even after passage of the REA, section 411(a)(7) still provides that the benefits protected by the anticutback rule may be accrued only by employees. We conclude that the "retirement-subsidy" provisions of section 411(d)(6)(B)(i) do not serve as a basis for disqualifying the Plan.

The fact that the NPF COLA did not come into effect until 1991 presents the question of whether, in providing the ad hoc payment from the NPF Fund for 1986 through 1990, the Trustees are deemed to have provided the NPF COLA benefits under the Plan before 1991, pursuant to section 1.411(d)-4, Q&A-1(c)(1), Income Tax Regs.[10] Respondent maintains that the pre-1991 series of ad

---

[10] Sec. 1.411(d)-4, Q&A-1(c)(1), Income Tax Regs., provides:

> (c) Plan terms. (1) General rule.
> Generally, benefits described in section 411(d)(6)(A), early retirement benefits, retirement-type subsidies, and optional forms of benefit are section 411(d)(6) protected benefits only if they are provided under the terms of a plan. However, if an employer establishes a pattern of repeated plan amendments providing for similar benefits in similar situations for substantially consecutive, limited periods of time, such benefits will be treated as provided under the terms of the plan, without regard to the limited periods of time, to the extent necessary to carry out the purposes of section 411(d)(6) * * * .
>
> (2) Effective date. The provisions of
> (continued...)

hoc payments from the NPF Fund established a pattern of repeated plan amendments providing for similar benefits in similar situations for substantially consecutive, limited periods of time. Hence, respondent argues, the ad hoc payments are treated under section 1.411(d)-4, Q&A-1(c)(1), Income Tax Regs., as permanent, nonforfeitable features of the Plan, without regard to the 1-year period of time actually provided in the amendments.

Respondent published Rev. Rul. 92-66, 1992-2 C.B. 93, describing operation of rules regarding a pattern of repeated plan amendments. That ruling provides:

> Whether the recurrence of plan amendments constitutes a pattern of amendments within the meaning of section 1.411(d)-4 of the regulations is determined on the basis of the facts and circumstances. Although no one particular fact is determinative, relevant factors include: (i) whether the amendments are made on account of a specific business event or condition; (ii) the degree to which the amendment relates to the event or condition; and (iii) whether the event or condition is temporary or discrete or whether it is a permanent aspect of the employer's business. [Id.]

The ruling addressed an employer's decision to offer an early retirement "window" to its employees during each of 3 consecutive years of adverse business conditions. In the fourth

---

[10](...continued)
paragraph (c)(1) of this Q&A-1 are effective as of July 11, 1988. Thus, patterns or [sic] repeated plan amendments adopted and effective before July 11, 1988 will be disregarded in determining whether such amendments have created an ongoing optional form of benefit under the plan.

year, business improved, but the employer's costs did not decrease to the extent projected. The employer accordingly offered an early retirement window for the fourth year as well. Respondent ruled that the employer's offering 4 consecutive years of an "early retirement window" was made on account of specific business conditions and was not designed to create a permanent benefit. Accordingly, the early retirement window provisions were not deemed to be part of the plan and could be discontinued without disqualifying the plan.

Rev. Rul. 92-66, supra, was found to be convincing in DeCarlo v. Rochester Carpenters Pension, Annuity, Welfare & S.U.B. Funds, 823 F. Supp. 115 (W.D.N.Y. 1993). There, the plaintiffs were retired union members. Their pension fund was "overfunded" for 1988, 1989, 1991, and 1992, and they were given an extra yearend payment (called, like the NPF COLAs, a "13th check"). Id. at 118. Because the plan's actuary warned that issuing a third consecutive 13th check in 1990 would violate the pattern of amendment provisions of section 1.411(d)-4, Income Tax Regs., the plaintiffs were not given a 13th check for 1990. The plaintiffs argued before the District Court that the plan's trustees had established a pattern of amendments that gave rise to a nonforfeitable right to a 13th check. The court disagreed. Relying on the provision of Rev. Rul. 92-66, supra, that made the existence of a pattern of amendments dependent upon whether the

amendments resulted from a "business event or condition", the court held that the payment of a 13th check depended upon the business event or condition of the Plan's being overfunded for the year in which the checks were issued. The court concluded that the payment of the 13th check did not confer a nonforfeitable benefit under section 1.411(d)-4, Income Tax Regs.

Here, in his reply brief, respondent concedes that the "effective date" provisions of section 1.411(d)-4, Q&A-1(c)(1), Income Tax Regs., require that only the 1989 and 1990 amendments to the Plan may be considered for purposes of section 1.411(d)-4, Income Tax Regs. Respondent continues to assert, however, that the ad hoc payments made in 1989 and 1990 should be considered to be part of the Plan, although the NPF COLA did not come into effect until 1991.

We disagree. Here, as in DeCarlo, petitioner's counsel warned in 1988 that, as a result of the new regulations, three consecutive plan amendments inserting an ad hoc COLA could be construed to be a permanent amendment providing COLAs. Having been alerted to the effects of repeated ad hoc payments, petitioner in 1989 doubled the funding required for the COLAs. Nevertheless, two ad hoc payments were still needed to meet the intended 3-percent COLA for 1989 and 1990. Thus, here, as in DeCarlo, the NPF Fund's two ad hoc payments were necessary because of adverse "business events or conditions". Moreover, in

1990, petitioner decided to change the COLA payments from a series of ad hoc payments into a permanent part of the plan. On these facts, we cannot say that, under section 1.411(d)-4, Income Tax Regs., the two ad hoc payments made to supplement the COLA for 1989 and 1990 represented a pattern of amendments that requires us to deem those two ad hoc payments as part of the NFC Plan before 1991. We recognize that, absent the required prospective application of the 1988 regulation, the chronic shortfall of the COLA funding from 1985 through 1991 might suffice to show that the persistent shortfalls were not really separate or transitory business events, but were rather indications of a continuous feature of the plan. As noted, however, section 1.411(d)-4, Q&A-1(c)(2), Income Tax Regs., precludes us from considering events before July 11, 1988.

We conclude that the 1995 plan amendments, although they removed COLA benefits which had been provided to the pre-1991 retirees, did not violate the anticutback provisions of section 411(d)(6). In so concluding, we find without merit all arguments not discussed herein. Accordingly,

<u>Decision will be entered</u>

<u>for petitioner</u>.