*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CHARLES THORNTON,

> *Plaintiff-Appellant,*

v.

GRAPHIC COMMUNICATIONS CONFERENCE OF
THE INTERNATIONAL BROTHERHOOD OF
TEAMSTERS SUPPLEMENTAL RETIREMENT
AND DISABILITY FUND, *et al.,*

> *Defendants-Appellees.*

No. 08-5283

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 07-00118—Charles R. Simpson III, District Judge.

Argued: March 6, 2009

Decided and Filed: May 14, 2009

Before: KEITH, SUTTON, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** William T. Payne, STEMBER, FEINSTEIN, DOYLE & PAYNE, Pittsburgh, Pennsylvania, for Appellant. Peter J. Leff, O'DONNELL, SCHWARTZ & ANDERSON, Washington, D.C., for Appellees. **ON BRIEF:** William T. Payne, Ellen Mary Doyle, Pamina Grace Ewing, STEMBER, FEINSTEIN, DOYLE & PAYNE, Pittsburgh, Pennsylvania, Michael D. Grabhorn, GRABHORN LAW OFFICE, Louisville, Kentucky, for Appellant. Peter J. Leff, O'DONNELL, SCHWARTZ & ANDERSON, Washington, D.C., for Appellees.

_____

## OPINION

_____

DAMON J. KEITH, Circuit Judge. Plaintiff-Appellant Charles Thornton challenges on appeal the district court's award of summary judgment in favor of Defendant-Appellees

Graphic Communications Conference of the International Brotherhood of Teamsters Supplemental Retirement and Disability Fund and its Board of Trustees regarding claims Thornton raised under the Employment Retirement Income Security Act of 1974 (ERISA). Thornton argues: (1) Defendants violated the ERISA anti-cutback rule by rescinding an increase of retirement benefits, which was introduced after he had retired; (2) the Board violated its fiduciary duty under ERISA by passing the amendment, which rescinded the increase; and (3) the district court abused its discretion in denying his Fed. R. Civ. P. 56(f) motion for discovery. For the following reasons, we **AFFIRM** the district court's decision to grant summary judgment in favor of Defendants on both substantive claims and **AFFIRM** its decision to deny Thornton's motion for discovery.

## I.

Defendant-Appellee Graphic Communications Conference of the International Brotherhood of Teamsters Supplemental Retirement and Disability Fund ("the Plan") is a multi-employer benefits plan that provides retirement benefits to employees in the graphic communications industry. The Plan provides monthly retirement benefits to eligible plan participants based on a formula that factors in the given participant's number of years of service, the covered wages as defined by the terms of the applicable plan document, and the respective employer's contribution rate. The Plan's Board of Trustees ("Board"), also a Defendant-Appellee in this case, serves as the Plan's sponsor and administrator.

Plaintiff-Appellant Charles Thornton ("Thornton") is a participant in the Plan who worked under covered employment until he retired on February 1, 1995. He commenced receiving his retirement benefits under the Plan as calculated by Section 4.1(B) of the Plan Document in effect at the time of his retirement.[1] Less than two years after Thornton's

---

[1]Section 4.1(B) of the Plan Document, effective October 1, 1994, states in relevant part:

> The amount of the Basic Retirement Benefit shall be calculated as follows:
>
> (i) For the period during which an Employee's Employer contributed to the Plan at 3% of Covered Wages, the annual Basic Retirement Benefit shall be in an amount equal to .670% of the Participant's Covered Wages earned to May 1, 1993, and .498% of the Participant's Covered Wages earned on or after May 1, 1993.
>
> (ii) For the period during which and Employee's Employer contributed to the Plan at a rate greater than 3% of Covered Wages, the annual Basic Retirement Benefit shall be

retirement, the Board amended the Plan to provide a three percent increase in benefits for all active and retired participants effective as of February 1, 1997 ["1997 Benefits Increase"]. The Board again amended the Plan the following year to provide an additional four percent benefits increase, compounded, to all participants effective as of February 1, 1998 ["1998 Benefits Increase"]. In January of 1999, the Board amended the Plan for a third time following Thornton's retirement and increased all participants' benefits by an additional 9.4 percent, compounded, effective February 1, 1999 ["1999 Benefits Increase"].

On December 6, 2002, the Board adopted a benefits reduction proposal, effective April 1, 2003, to rescind the 1999 Benefits Increase for Plan participants, like Thornton, who retired from covered employment prior to February 1, 1999 ["December 2002 Amendment"]. The 1997 and 1998 Benefits Increases remained intact after the December 2002 Amendment and Thornton continues to receive lifetime monthly retirement benefits that reflect those increases. Defendants allege the amendment to rescind the 1999 Benefits Increase was passed in response to advice received from an actuarial consultant who claimed the Plan faced a significant funding shortfall, which, if not remedied, would jeopardize the Plan's long term financial viability.

On March 5, 2007, Thornton filed a class action suit in the Western District of Kentucky on behalf of himself and other similarly situated individuals who received Plan benefits prior to February 1, 1999 and experienced a reduction in those benefits as a result of the December 2002 Amendment. As succinctly stated by the district court:

> Count One of Thornton's First Amended Class Action Complaint alleges
> that by rescinding the February 1, 1999 benefit increase provided to those
> employees who had retired prior to February 1, 1999, the Plan and the

---

in amount equal to the amount described in subsection (i) of this Section **PLUS** an additional annual amount. The additional amount is .343% of the Participant's Covered Wages earned to May 1, 1993, for each 1% that Contributions exceed 3%. For Covered Wages earned on or after May 1, 1993, the additional amount is .417% of the Participant's Covered Wages for each 1% that Contributions exceed 3%.

(iii) The Basic Retirement Benefit is payable at a rate of 1/12th monthly following retirement and continues for life.

> Board of Trustees violated the anti-cutback rule set forth in ERISA
> § 204(g), 29 U.S.C. § 1054(g).  Count Two alleges that the Board of
> Trustees, in taking such action, breached their fiduciary duty by failing
> to administer the Plan in accordance with ERISA § 404(a)(1)(D), 29
> U.S.C. § 1104(a)(1)(D).

*Thornton v. Graphic Comm. Conference of the Int'l Bhd. of Teamsters Supp. Ret. and Dev. Fund*, No. 3:07-CV-118-S, 2008 WL 474416, at *1 (W.D. Ky. Feb. 19, 2008) (unpublished).  In response to Thornton's complaint, Defendants filed a Fed. R. Civ. P. 12(b)(6) motion to dismiss, and in the alternative, a motion for summary judgment pursuant to Fed. R. Civ. P. 56 ("Rule 56").  Thornton filed an opposition to both of those motions and submitted a Rule 56(f) affidavit requesting more time to conduct discovery prior to the district court's ruling on Defendants' dispositive motions.

On February 19, 2008, the district court ruled that the December 2002 Amendment rescinding the 9.4 percent increase did not violate the ERISA anti-cutback rule because the Plan amendment granting the 1999 Benefits Increase was adopted after Thornton retired in 1995.  *Thornton,* 2008 WL 474416, at *4.  The court further ruled that discovery sought by Thornton pursuant to Rule 56(f), relating to documents surrounding the December 2002 Amendment and other post-retirement benefit increases, was unnecessary given that Defendants had already proffered the Plan Document in effect at the time of Thornton's retirement in 1995.  *Id.*  Finally, having held the rescission of the 9.4 percent increase was not in violation of ERISA, the court reasoned that the Board similarly did not breach its fiduciary duty in passing the amendment.  *Id.* The  district court granted Defendants' motion for summary judgment and dismissed Thornton's complaint.  On February 26, 2008, Thornton timely appealed the district court's decision.

## II.

We review a district court's award of summary judgment de novo.  *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002).  "Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."  *Id.*  Our inquiry focuses on "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When reviewing a grant of summary judgment, "[w]e must view the facts contained in the record and draw all inferences from the record in the light most favorable to the nonmoving party." *McClain v. N.W. Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 327 (6th Cir. 2006).

### III.

Thornton argues on appeal that Defendants violated ERISA's anti-cutback rule by adopting an amendment to the Plan that eliminated the 1999 Benefits Increase for pre-February 1, 1999 retirees. The central mission of ERISA is to protect "employees' justified expectations of receiving the benefits their employers promise them." *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004). The anti-cutback rule serves a critical role in this enterprise by prohibiting pension plan amendments that decrease plan participants' "accrued benefits." ERISA, § 204(g), 29 U.S.C. § 1054(g) (2006); *see also Central Laborers'*, 541 U.S. at 744.[2] The anti-cutback rule also appears in the Internal Revenue Code, pursuant to Title II of the ERISA statute, in materially identical form and disqualifies from tax-exempt status those pension plans that violate its conditions. I.R.C. § 411(d)(6); *see also* I.R.C. § 401(a) (defining a qualified pension plan under ERISA); I.R.C. § 411(a) (disqualifying from coverage under IRC § 401(a) those pension plans which do not provide that an employee's rights to normal retirement benefits be "nonforfeitable"); I.R.C. § 501(a) (granting tax-exempt status to qualified pension plans).[3] The parallel ERISA and IRC provisions serve the same function, which

---

[2]The "ERISA" anti-cutback rule states that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title [exceptions inapplicable to the instant appeal]." 29 U.S.C. § 1054(g)(1).

[3]The "IRC" anti-cutback rule states that "[a] plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan, other than an amendment in section 412(d)(2), or section 4281 of [ERISA] [exceptions inapplicable to the instant appeal]." I.R.C. § 411(d)(6)(A).

is to safeguard the benefits an employee has been promised and earned over time by fulfillment of the Plan's conditions. *See Central Laborers'* 541 U.S. at 743, 746.[4]

Because only an "accrued benefit" is protected by the anti-cutback rule, the scope of the rule directly depends on the meaning of "accrued benefit." In relevant part, the IRC defines an "accrued benefit" "in the case of a defined benefit plan, [as] the employee's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." I.R.C. § 411(a)(7)(A)(i).[5] Thus, the fundamental question on appeal is whether the Plan's 1999 Benefits Increase of 9.4 percent constituted an "accrued benefit" for pre-February 1, 1999 retiree plan participants such that its later rescission by the December 2002 Amendment violated the anti-cutback rule of IRC § 411(d)(6)(A). We hold that it does not.

A core issue confronting the Court is to what extent we must consider, and possibly defer to, Treasury interpretations of the statutory definition of "accrued benefit" and the corresponding anti-cutback rule.[6] To answer this question, we invoke *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), which sets forth the two-step process courts apply when reviewing an agency's construction of a statute that it administers. We have previously summarized the *Chevron* analysis as follows:

> First, always, is the question whether Congress has directly spoken to the *precise question at issue*. If the intent of Congress is clear, that is the end

---

[4] The Supreme Court explained the "curious" relationship between ERISA and the Internal Revenue Code in *Central Laborers'*. Title I of ERISA was adopted to create substantive legal protections relating to employee pension plans while Title II of the statute amended the IRC to condition a plan's favorable tax treatment on its compliance with many of ERISA's Title I requirements, including the anti-cutback rule. *Central Laborers'*, 541 U.S. at 746. As a result, many of ERISA's substantive protections have "nearly verbatim replication" in the IRC. *Id.* The anti-cutback rule is one such provision that is duplicated in ERISA § 204(g) and IRC § 411(d)(6). *Id.* The significance of this relationship is that an otherwise qualifying pension plan that fails to adhere to the anti-cutback rule loses its tax-exempt status.

[5] The definition of "accrued benefits" in ERISA is materially identical to that of the IRC. In relevant part, ERISA defines "accrued benefit" " in the case of a defined benefit plan," as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A).

[6] The Secretary of the Treasury possesses ultimate authority to issue agency interpretations of IRC § 411, which contains the definition of "accrued benefit" as well as the anti-cutback rule. *See* 29 U.S.C. § 1202(c); *see also* 29 C.F.R. § 2530.200a-2 (stating that regulations prescribed by the Secretary of Treasury under IRC § 411 also apply to the parallel provisions found in ERISA).

of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 273 (6th Cir.1994) (emphasis in original) (citing *CenTra, Inc. v. United States*, 953 F.2d 1051 (6th Cir.1992)). The Supreme Court has explained that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear legislative intent." *Chevron*, 467 U.S. at 843 n. 9.

Second, if we determine that Congress has not directly addressed the precise question at issue, that is, that the statute is silent or ambiguous on the specific issue, we must determine "whether the agency's answer is based on a permissible construction of the statute." *Jewish Hosp., Inc.*, 19 F.3d at 273. In assessing whether the agency's construction is permissible, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 273-74 (citing *Chevron*, 467 U.S. at 843 n. 11). In fact, the agency's construction is entitled to deference unless "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

*Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 408-09 (6th Cir. 2007) (some citations omitted).

Thornton argues on appeal that the statutory definition of "accrued benefits" in IRC § 411(a)(7)(A)(i) is ambiguous under *Chevron* step one with respect to post-retirement increases in benefits. He contends this Court must therefore defer to the Treasury's interpretations of the statute, which allegedly establish that post-retirement benefit increases are "accrued" and protected by the anti-cutback rule. Defendants counter that the statutory definition of "accrued benefit" unambiguously excludes post-retirement benefit increases and thus prohibits the Court from considering the Treasury authorities construing the statute. In the alternative, Defendants argue that even if the statute is ambiguous with respect to post-retirement increases, the applicable Treasury regulations confirm that such benefits are not "accrued." They add that if weight is to be accorded to a Treasury interpretation of "accrued benefit" and the anti-cutback rule, it should be to an IRS letter granting the Plan favorable tax-exempt status.

We need not decide, however, whether ERISA's definition of accrued benefits is ambiguous. As explained below, no agency regulation—nor even an agency interpretation of its regulations that merits deference—addresses whether Thornton's post-retirement benefit increase is an accrued benefit. It thus makes no difference to the outcome of this case whether the statute's language unambiguously addresses the question or whether it instead leaves room for as-yet-unexercised agency discretion.[7] We conclude only that, absent contrary guidance, the best interpretation of the statue and of the Plan is that the benefit increase here is not an accrued benefit. Thus, we save the "ambiguity" determination of *Chevron* for another day.

## A. Construction of "Accrued Benefit"

In ordinary parlance, an "accrued benefit" refers to a pension "benefit that has accumulated by growth." *See, e.g., LaBrosse v. Trustees of Asbestos Workers Local 47 Ret. Trust Plan*, 186 F. Supp. 2d 791, 795 (W.D. Mich. 2001). Congress refined this definition by declaring that an "accrued benefit" in the ERISA context specifically meant, "in the case of a defined benefit plan, the employee's accrued benefit determined under the plan and . . . in the form of an annual benefit commencing at normal retirement age." I.R.C. § 411(a)(7)(A)(i). Because the meaning of the "accrued benefit" statutory definition with respect to post-retirement increases in benefits is an issue of first impression in this Circuit, we consider it worthwhile to first examine the views of our colleagues in the Fourth Circuit, who had occasion to address this very issue in *Board of Trustees of Sheet Metal Workers' Nat'l Pension Fund v. Comm'r* ("*Sheet Metal Workers'*")*, 318 F.3d 599 (4th Cir. 2003).

The court in *Sheet Metal Workers'* reviewed a two percent annual cost-of-living-adjustment (COLA) granted by the Sheet Metal Workers' National Pension Fund plan

---

[7]When the agency has not spoken authoritatively on the issue at hand, we bypass *Chevron*'s framework and interpret the statute as we would any other: by offering our best construction of the law's terms. *See, e.g.*, *Christensen v. Harris County*, 529 U.S. 576, 587–88 (2000); *Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 366–68 & n.14 (1994); *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 106–09 (1993); *cf. Smith v. City of Jackson*, 544 U.S. 228, 264–65 & n.2 (2005) (O'Connor, J., joined by Kennedy and Thomas, JJ., concurring in the judgment).

to pension fund participants in 1992, which the plan made effective retroactively to January 1, 1991. The terms of the pension plan document(s) in effect before 1991 did not include the COLA among their benefits. Nevertheless, the COLA increase was extended to all retirees, including those who separated from covered employment before January 1, 1991. All retirees under the plan received the COLA benefit for three years until the plan trustees amended the plan again in 1995 to eliminate the benefit for participants who retired before January 1, 1991.

After passing the amendment, the plan's trustees sought from the IRS a determination regarding whether the pension plan remained qualified for tax-exempt status.[8] The IRS's national office ultimately concluded that the COLA conferred in 1992 was an "accrued benefit" under IRC § 411(a)(7)(A)(i). As a result, the IRS found that rescinding the COLA for pre-1991 retirees violated the anti-cutback rule and disqualified the pension fund from tax-exempt status. The plan's trustees brought a declaratory judgment action in U.S. Tax Court in response to this decision to determine their compliance with the anti-cutback rule. They argued the COLA increase did not create an "accrued benefit" for pre-1991 retirees because the benefit was conferred after those individuals had retired. The Tax Court ultimately sided with the pension fund, concluding ERISA was intended to protect only retirement benefits acquired during an employee's term of service. *See* 117 T.C. 220, 229 (2001).

In reviewing the case on appeal, the Fourth Circuit engaged in a close reading of the text of IRC § 411(a)(7)(A)(i). *Sheet Metal Workers',* 318 F.3d at 602-03. The court resolved the surface ambiguity created by the circular reference to "accrued benefit determined under the plan" in the first part of the definition by observing that although "this definition does not purport to describe what counts as an 'accrued benefit' for all participants in all qualifying plans" it did serve as "a signpost directing us to look to the terms of the plan at issue." *Id.* The court further noted that the only textual limitation

---

[8]A pension plan regulated by ERISA loses its tax-exempt status if it violates the anti-cutback rule by eliminating or reducing "the accrued benefit of a participant . . . by an amendment of the plan." I.R.C. § 411(d)(6)(A).

on the instruction to refer to the terms of the plan was found in the second part of the definition, which required that the "accrued benefit" be "expressed in the form of an annual benefit commencing at normal retirement age." *Id.* at 603.

*Sheet Metal Workers'* next turned to the immediate statutory context of IRC § 411(a)(7)(A)(i) for further insight into the meaning of "accrued benefit." The court focused its attention on the requirement that a qualifying pension plan guarantee that the "accrual of benefits" created by "contributions to the plan" become "nonforfeitable" under the standards articulated in IRC § 411 in order for the plan to enjoy tax-exempt status. *Sheet Metal Workers'*, 318 F.3d at 603; *see also* 26 U.S.C. §§ 401(a), 411, 501(a). *Sheet Metal Workers'* specifically found IRC § 411:

> ensures the eventual payout of (1) a retirement benefit (2) created by contributions made by the employer, by the employees, or by both (3) **in accordance with the plan in effect while the employee works in the service of the employer.** *See, e.g.*, 26 U.S.C. § 411(a)(1)-(2) (providing when the various contributions vest); § 411(a)(4) (addressing what "service [is] included in determination of nonforfeitable percentage"); § 411(a)(5) (defining "year of service"); § 411(a)(6) (addressing the effects of "breaks in service"). Thus, when § 411(a)(7)(i) refers to "accrued benefit," it refers to a benefit created by the accumulation of contributions and limited in its form of payment as " *determined under the plan* " and "expressed in the form of an annual benefit commencing at normal retirement age" (emphasis added), but it does not describe what a given plan participant's accrued benefit would be. The statute leaves this level of detail to plan drafters who, of course, remain bound by other provisions of ERISA and the Tax Code."

*Id.* (bolding added).

Based on this review of the text and context, the Fourth Circuit concluded that an "accrued benefit" under ERISA was only that which was: "(1) expressed by the plan as an annual benefit commencing at normal retirement age and (2) paid from a trust funded by the accumulation of contributions made by the employer, the employees, or both (3) in accordance with plan terms." *Id.* The court proceeded to examine the terms of the Sheet Metal Workers' pension fund plan document in effect before 1991, while the pre-1991 retirees were still employed, and observed:

the employees who retired before 1991 were never promised a COLA benefit by the Plan in existence during their service, and they had no reason to expect that the Plan would provide a COLA during retirement. As a result, . . . the COLA was not an "accrued benefit" for pre-1991 retirees. They retired with the fulfillment of the promise for an "annual benefit commencing at normal retirement age" but without a COLA. When, after they were separated from employment by retirement, they were given a COLA benefit, the benefit could not have been an "accrued benefit" because it did not accumulate during their service so as to become part of their legitimate expectations at retirement under the terms of the Plan then in effect.

*Id.* (internal citation omitted).

Rather than considering the COLA an "accrued benefit," the court instead characterized it as a mere "gratuitous benefit provided . . . after retirement which could therefore be withdrawn without impairing the promised benefit that had accrued at their retirement." *Id. Sheet Metal Workers'* concluded by stating that "[b]ecause the COLA was not an accrued benefit for pre-1991 retirees, the trustees did not violate the anti-cutback rule [] when they amended the Plan in 1995 to exclude the pre-1991 retirees from the COLA." *Id.* at 605-06.

We believe the Fourth Circuit's thorough analysis of the text and context of IRC § 411(a)(7)(A)(i) demonstrates that Congress did not consider a post-retirement increase in pension benefits to be an "accrued benefit." Section 411's repeated emphasis on the accrual of benefits during "service" makes plain that the terms of pension plan document(s) in effect while a participant worked for a covered employer dictate his or her "accrued benefits." We do not find, and Thornton has not offered, any indication in the language of § 411(a)(7)(A)(i), or statutory construction thereof, that even remotely suggests that a given participant may amass "accrued benefits" after he or she permanently separates from covered employment. Consequently, we hold that a post-retirement increase in benefits does not create an "accrued benefit" for a given participant under IRC § 411(a)(7)(A)(i) unless it is "in accordance with the plan in effect while the employee works in the service of the employer." *Sheet Metal Workers'*, 318 F.3d at 603.

We are not alone in endorsing the Fourth Circuit's conclusions regarding IRC § 411(a)(7)(A)(i). The Seventh Circuit also confronted the application of the anti-cutback rule and the meaning of "accrued benefits" in *Williams v. Rohm & Haas Pension Plan*, 497 F.3d 710, 713-14 (7th Cir. 2007). After analyzing the statutory definition of "accrued benefit," *Williams* held that a pension plan's failure to include a COLA in the lump distribution of benefits, as it did with annuities, violated the anti-cutback rule. *Id.* at 714. *Williams* conceded, however, that the COLA would not have been "accrued" if it had "not [been] included in the plan during the term of the participants' employment," as was the case in the Fourth Circuit's decision in *Sheet Metal Workers'*. *Id.*

Congress's stated motivations for enacting ERISA, particularly the anti-cutback rule, corroborate our conclusion that what amounts to an "accrued benefit" depends strictly on the terms of the pension plan(s) in effect while the employee was engaged in covered employment. For example, the Congressional findings and Declarations of Policy accompanying the substantive protections of ERISA indicate that prior to the statute, "despite the enormous growth in [pension] plans many employees with *long years of employment* are losing *anticipated retirement benefits* owing to the lack of vesting provisions in such plans." 29 U.S.C. § 1001(a) (emphasis added). Furthermore, the Senate Committee on Finance Report recommending the passage of ERISA noted its concern that "pension rights which have slowly been *stockpiled over many years* may suddenly be lost if the employee leaves or loses his job prior to retirement." S. Rept. 93-383, at 45 (1974) (emphasis added). Both of these authorities reaffirm Congress's focus on the protection of pension benefits painstakingly accumulated by an employee in the service of his or her employer in anticipation of, and reliance on, promised benefits. Moreover, they show no legislative concern for the guarantee of benefits doled out of the pension plan's largesse after the employee ceases covered employment.

Juxtaposition of the plain text of the statutory definition of "accrued benefit" in IRC § 411(a)(7)(A)(i) and that of the anti-cutback rule in IRC § 411(d)(6)(A) adds further support to our position that accrual occurs during employment and that pension

benefits conferred post-retirement do not enjoy protection under the anti-cutback rule. *See Sheet Metal Workers'*, 117 T.C. at 228-29. As the Tax Court noted in the *Sheet Metal Workers'* litigation, while IRC § 411(a)(7)(A)(i) refers to an "*employee's* accrued benefit," IRC § 411(d)(6)(A) conspicuously protects the "accrued benefit of a *participant*" from reduction or elimination. *Id.* (emphasis added). We agree with the inferences made by the Tax Court regarding this variation in language, specifically, "that a retirement benefit may be 'accrued' only by an 'employee', but, once accrued, the benefit is protected from diminution as long as the individual who accrued the benefit is a 'participant' in the plan, whether as an employee or as a retiree." *Id.*

The well-established understanding of ERISA is that the statute operates to protect a working employee's reliance upon, and expectation of, promised benefits upon retirement. *See Bellas v. CBS, Inc.*, 221 F.3d 517, 522 (3d Cir. 2000) ("Congress's chief purpose in enacting [ERISA] was to ensure that workers receive promised pension benefits upon retirement."). It does not safeguard "gratuitous benefit[s] provided [] after retirement" to plan participants who did not toil in "long years of employment" without expectation of such benefits. *See Sheets Metal Workers',* 318 F.3d at 604. As the Supreme Court explained, ERISA ensures that "if a worker has been promised a defined pension benefit *upon retirement*-and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually will receive it." *Nachman Corp. v. Pension Ben. Guaranty Corp.*, 446 U.S. 359, 375 (1980) (emphasis added); *see Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511, n.5 (1981) (noting ERISA was passed to ensure that "employee pension expectations are not defeated" after "'long years of employment'") (quoting 29 U.S.C. § 1001(a)); *see also Scardelletti v. Bobo*, No. Civ. No. JFM-95-CV-5, 1997 WL 33446689, at *10 (D. Md. Sept. 8, 1997) (unpublished) (interpreting *Alessi* to stand for the proposition that "if an employee works with the expectation that she is earning, and will receive, a pension benefit, an employer may not later decide not to give her the benefit that it has promised and she has earned," while holding that a COLA was not an accrued benefit in its case because it was conferred after the plan participant retired). The touchstone of an "accrued benefit" is reliance.

Only when an individual could rely, even if just implicitly, on a promised benefit as a basis for continued employment can a benefit be "accrued." Therefore, based on this well-established understanding of ERISA, the parallel statutory definition of "accrued benefit" in IRC § 411(a)(7)(A)(i) cannot be reasonably construed to apply to post-retirement increases in benefits unless the increase was specified in the pension plan document(s) in effect while the employee worked in the service of the employer.[9]

In the face of substantial authority to the contrary, Thornton claims IRC § 411(a)(7)(A)(i) is inherently ambiguous because of the definition's circular reference to "accrued benefits." He essentially argues that Congress's intent remains unclear regarding post-retirement increases in benefits because the statutory definition itself is not sweeping in defining what amounts to an "accrued benefit." We acknowledge the provision, when read in isolation, does not definitively describe which pension benefits qualify as "accrued benefits." But it need not do so. What Thornton describes as ambiguity in the definition of "accrued benefit" is simply a reflection of Congress's considered judgment that attempts to delineate the universe of "accrued benefits" in the plain text of the statute would be incomplete. Congress instead reserved this responsibility to the employer and the employee through the agreed-upon terms of the plan document. As the Fourth Circuit remarked, "it should be apparent that [IRC § 411(a)(7)(A)(i)] does not purport to describe what counts as an 'accrued benefit' for all participants in all qualifying plans. Rather, the statutory definition is a signpost directing us to look to the terms of the plan at issue." *Id.* at 602-03.

The application of the statutory definition in the instant case is straightforward. After Thornton retired on February 1, 1995, he began receiving the Plan's "Basic Retirement Benefits," as set forth in the Plan Document effective as of October 1, 1994. Thornton does not allege that he failed to receive anything promised to him under the 1994 Plan Document. The post-retirement benefits increase of 9.4 percent, for which

---

[9]We also find it significant that Thornton's proposed construction of "accrued benefit" may cause pension plans to "avoid providing gratuitous benefits in the future for fear of being locked in perpetually." *Sheet Metal Workers'*, 318 F.3d at 605. This harmful disincentive would jeopardize the welfare of the very retirees Thornton seeks to champion through his suit.

Thornton seeks recovery, was not incorporated into the Plan until February 1, 1999, four years after he retired. Because the Plan's 9.4 percent benefit increase was not found in the terms of the 1994 Plan Document effective at the time of Thornton's retirement in 1995, nor in any prior Plan document in effect while he was employed, Thornton could not have possibly relied upon the 1999 Benefits Increase as a condition of his continued employment.

As the district court stated below, "the increase could not have been an 'accrued benefit' because it did not accumulate during his service so as to become part of his legitimate expectations at retirement." *Thornton*, 2008 WL 474416, at *3. The 1999 Benefits Increase was merely a "gratuitous benefit" which was lawfully withdrawn by the Plan in December 2002 "without impairing the promised benefit that had accrued" at Thornton's retirement." *Sheet Metal Workers'*, 318 F.3d at 604. Because the 1999 Benefits Increase did not create an "accrued benefit" for pre-February 1, 1999 retirees, Defendants did not violate the anti-cutback rule in eliminating the 1999 Benefits Increase for Thornton.

The terms of the Plan also support this conclusion for a different reason. Although ERISA leaves a plan's drafters considerable leeway in devising an accrual formula, it "set[s] outer bounds on permissible accrual practices." *Alessi*, 451 U.S. at 512. Namely, it requires that whatever accrual formula a plan adopts, it must yield an accrued benefit that equals or exceeds the benefit the employee would have at that time under any one of the three statutory formulas—all of which ultimately depend on the number of years an employee has worked to date. *See* 29 U.S.C. § 1054(a)(1), (b)(1). The Plan here goes a step further, linking a participant's pension entitlement not only to the total number of years he has worked, but keying it to *specific* years the employee has worked. Given this focus on the benefit an employee has stockpiled in particular years of service—and given that under ERISA and the Plan an employee must be able to know what his accrued benefit is at any point in time in order to compare it to the statutory minimums—it makes sense that accrued benefits include only what an employee has earned incrementally over the course of employment, determined by the plan provisions

in effect at the time the employee earned them. After-the-fact, across-the-board bonuses, like the post-retirement increase Thornton received here, do not fit that description.

Thornton argues that a benefit improvement provided to him after he retired is an "accrued benefit" because the 1994 Plan stated that it may be amended or supplemented. But under the definition of "accrued benefit" explained above, an amendment to the plan affects the accumulation of "accrued benefits" only for participants contemporaneously engaged in covered employment, not those of a participant already retired. Put differently, while a particular plan amendment may increase the actual dollar amount of pension benefits, it does not affect a given participant's portfolio of "accrued benefits" under IRC § 411(a)(7)(A)(i) if the amendment occurred after he or she permanently separated from covered employment. Thus, any Plan amendments issued after Thornton retired are immaterial to his portion of "accrued benefits." *Cf.* 26 C.F.R. § 1.411(d)-4, Q & A-2(a)(1) (allowing plan amendments that reduce or eliminate benefits that would be accrued benefits but that have "not yet accrued" under the plan terms in effect, making the terms in effect when the employee earned a given unit of pension credit pivotal).

For these reasons, we find the Plan's 1999 Benefits Increase was not an "accrued benefit" under IRC § 411(a)(7)(A)(i) for plan participants like Thornton who retired prior to February 1, 1999. Therefore, the Plan's rescission of the benefits increase for pre-February 1, 1999 retirees in December 2002 did not violate the anti-cutback rule.

**B. Treasury Regulations**

As mentioned above, *Chevron* requires courts to defer to an agency's construction of an ambiguous statute, which the agency is charged to administer, unless the construction is "arbitrary, capricious, or manifestly contrary to the statute." *See Battle Creek Health Sys.*, 498 F.3d at 408 (quoting *Chevron*, 467 U.S. at 844). Deference to a reasonable interpretation of the statute is required even if the court does not consider it to be the best interpretation. *See Nat'l Cable & Telcomm.'s Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Thornton argues that three separate

Treasury regulations establish that the Plan's 1999 post-retirement benefit increase created an "accrued benefit" which was protected by the anti-cutback rule: (1) 26 C.F.R. § 1.411(d)-3; (2) 26 C.F.R. § 1.411(a)-7; and (3) 26 C.F.R. § 1.411(d)-4, Q & A-1(c)(1). Accordingly, he claims that this Court is compelled to defer to the alleged agency interpretations and find that the rescission of the 1999 Benefits Increase for pre-February 1, 1999 retirees violated the anti-cutback rule. Even assuming for the sake of argument that the statute is ambiguous—a question we do not decide—we agree with Defendants and conclude that none of the above regulations would be dispositive of the matter before this Court. Therefore, they do not impose any obligations under *Chevron*.

*1. 2005 Regulation - 26 C.F.R. § 1.411(d)-3*

Treasury promulgated 26 C.F.R. § 1.411(d)-3 ["2005 Regulation"] to interpret the anti-cutback rule. It states in relevant part:

> The protection of section 411(d)(6) [anti-cutback rule] applies to a participant's entire accrued benefit under the plan as of the applicable amendment date, without regard to whether the entire accrued benefit was accrued before a participant's severance from employment or whether any portion was the result of an increase in the accrued benefit of the participant pursuant to a plan amendment adopted after the participant's severance from employment.

26 C.F.R. § 1.411(d)-3(a). The 2005 Regulation directly supports Thornton's position that post-retirement benefits increases are considered "accrued benefits" because the regulation urges application of the anti-cutback rule even when the applicable amendment granting benefits occurs after the participant permanently separates from employment. Notwithstanding this clear principle, the regulation also states that it applies to amendments of benefit plans "adopted on or after August 12, 2005." 26 C.F.R. § 1.411(d)-3(j)(1). Because the Board amended the Plan to rescind the 1999 Benefit Increase in December 2002, more than two and a half years before the 2005 Regulation's effective date, we cannot consider the 2005 Regulation in the instant case.

Thornton argues the 2005 Regulation reflects the agency's long-standing position on this issue and thus should be applied retroactively. But Treasury emphatically

declared otherwise in the corresponding Federal Register notice accompanying the regulation's promulgation, "[p]lan amendments adopted before August 12, 2005 are to be evaluated in light of the applicable authorities *without regard to these regulations. No implication is intended* concerning whether or not a rule adopted prospectively in these regulations is applicable law before the effective date in these regulations." Section 411(d)(6) Protected Benefits, 70 Fed. Reg. 47109, 47115 (Aug. 12, 2005) (emphasis added). Given this unequivocal instruction, we cannot consider the 2005 Regulation as Treasury's interpretation of the statutory anti-cutback rule prior to August 12, 2005.

*2. 2002 Regulation - 26 C.F.R. § 1.411(a)-7*

The parties agree that 26 C.F.R. § 1.411(a)-7 ["2002 Regulation"] was in effect in December 2002 when the Plan rescinded the 1999 Benefits Increase for pre-February 1, 1999 retirees. In addition to providing a definition for "accrued benefit" materially identical to the statutory definition, the 2002 Regulation describes "accrued benefit" as generally referring to "pension or retirement benefits." 26 C.F.R. § 1.411(a)-7(a)(1).[10] The 2002 Regulation also distinguishes "accrued benefits" from "ancillary benefits," such as payment of medical expenses and life insurance benefits, which are not directly related to retirement benefits. 26 C.F.R. § 1.411(a)-7(a)(1)(ii); *see also* H.R. Rep. No. 93-807 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 4670, 4726 (ERISA House Ways and

---

[10]26 C.F.R. § 1.411(a)-7(a)(1) states in relevant part:

(a) Accrued benefit. For purposes of section 411 and the regulations thereunder, the term "accrued benefit" means--

(1) Defined benefit plan. In the case of a defined benefit plan--

(i) If the plan provides an accrued benefit in the form of an annual benefit commencing at normal retirement age, such accrued benefit, or

(ii) . . . . In general, the term "accrued benefits" refers only to pension or retirement benefits. Consequently, accrued benefits do not include ancillary benefits not directly related to retirement benefits such as payment of medical expenses (or insurance premiums for such expenses), disability benefits not in excess of the qualified disability benefit (see section 411(a)(9) and paragraph (c)(3) of this section), life insurance benefits payable as a lump sum, incidental death benefits, current life insurance protection, or medical benefits described in section 401(h).

Means Committee Report explaining that to "require vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income"). Thornton reasons that because the 1999 Benefits Increase was clearly not an "ancillary benefit," a point Defendants appear to concede, the Court must necessarily characterize it as an "accrued benefit" under the 2002 Regulation. Under this interpretation of the 2002 Regulation, Defendants' rescission of the 1999 Benefits Increase for pre-February 1, 1999 retirees would clearly violate the anti-cutback rule.

We reject Thornton's interpretation of the 2002 Regulation because of the false dichotomy he draws between "ancillary" and "accrued" benefits. The Seventh Circuit recognized that a particular benefit, even if non-ancillary, would not be "accrued" for a retired participant if the benefit was "not included in the plan during the term of the participants' employment." *See Williams*, 497 F.3d at 713-14. *Williams* clarified the Seventh Circuit's earlier position in *Hickey v. Chicago Truck Drivers*, 980 F.2d 465, 468-69 (7th Cir. 1992) (holding pension conferred COLA was an "accrued benefit" and not "ancillary" because it was intended to provide retirement income, commenced only at retirement, and was a benefit generally transferrable to succeeding employers)*, upon which Thornton relied for the proposition that non-ancillary benefits were necessarily "accrued" under ERISA. Although the 2002 Regulation could conceivably be interpreted to support Thornton's more expansive notion of "accrued benefits" based on the regulation's text, we agree with *Williams* and find that the interpretation of the 2002 Regulation most faithful to ERISA is that non-ancillary benefits granted after a participant separates from covered employment are not "accrued" when "not included in the plan during the term of the participants' employment." *See Williams*, 497 F.3d at 713-14.

Nevertheless, even if we believe that Thornton's interpretation of the 2002 Regulation is not the most plausible, the question remains whether we must nonetheless defer to his position because of Treasury's own interpretation of the 2002 Regulation. In this regard, Thornton argues we must defer to the interpretation of the 2002

Regulation articulated by Treasury during the *Sheet Metal Workers'* litigation.[11]  The deference accorded to an agency's interpretation of its own ambiguous regulation is substantial and afforded even greater consideration than the *Chevron* deference accorded to an interpretation of an ambiguous statute.  *See United States v. Cinemark USA, Inc.*, 348 F.3d 569, 578 (6th Cir. 2003).  In particular, an interpretation established through an agency's litigation position is "'controlling' where the interpretation reflected a 'fair and considered judgment' and [is] not 'plainly erroneous or inconsistent with the regulation.'"  *Huffman v. Comm'r,* 518 F.3d 357, 368 (6th Cir. 2008) (quoting *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997)).  The fact that the agency's interpretation is rendered in a legal brief does not make it "unworthy of deference."  *Auer*, 519 U.S. at 462.

In *Sheet Metal Workers'*, Treasury argued that a COLA added to a pension plan was an "accrued benefit" for plan participants who had already retired before the COLA was introduced and thus, protected by the anti-cutback rule.  *See* Reply Brief of Respondent-Appellant, *Board of Trustees of Sheet Metal Workers' Nat'l Pension Fund v. Comm'r.*, 318 F.3d 599 (No. 02-1273), 2002 WL 32727592, at *2.  To support this claim, Treasury specifically relied upon its ad hoc interpretation of the 2002 Regulation that when a benefit is non-ancillary, it must necessarily be "accrued."  *Id.* at * 2, 5.[12]  Accordingly, the agency reasoned that the post-retirement COLA increase issued by the Sheet Metal Workers' pension plan was "accrued" because it was non-ancillary.  *Id.*  This is precisely the view Thornton adopts in the instant case.

Assuming *arguendo* Treasury's litigation position in *Sheet Metal Workers'* actually reflected the agency's "fair and considered judgment" of the 2002 Regulation, we still need not accord it any deference for the simple reason that Treasury's stance in

---

[11]The Commissioner of the Internal Revenue Service was the named agency party in the *Sheet Metal Workers'* litigation.

[12]Treasury declared that, "[s]ince the COLA at issue in this case is unquestionably a retirement benefit, and not an ancillary benefit, then it should also be considered to be an 'accrued benefit' that cannot be eliminated from the plan without violating the anti-cutback rule." Reply Brief of Respondent-Appellant, *Sheet Metal Workers'*, 2002 WL 32727592, at *2.

that case did not represent the agency's final word on the matter. As the Supreme Court has recognized, "[a]n administrative agency is not disqualified from changing its mind." *N.L.R.B. v. Local 103, International Assoc. of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 351 (1978). The record on appeal includes a recent IRS letter, dated December 5, 2008, discussing the agency's audit of the Graphic Artists Industry Joint Pension Trust Plan (JPT), a multi-employer pension benefits plan entirely separate from the Defendant in this case. Letter from Monika A. Templeman, Director Employee Plans (EP) Examinations, Internal Revenue Service, to Graphic Arts Industry Joint Pension Plan Trust (Dec. 8, 2008).[13] The letter indicates the IRS had initially considered a JPT amendment to eliminate a COLA benefit, previously granted to retirees, to be a violation of the anti-cutback rule under the 2005 Regulation, consistent with its litigation position in *Sheet Metal Workers'*. *Id.* But the letter goes on to state that the IRS abandoned this position after realizing JPT's amendment occurred prior to August 12, 2005, the effective date of the 2005 Regulation. As a result, the IRS advised JPT that rescinding the COLA previously granted to plan participants who were already retired at the time the COLA was introduced did not violate the anti-cutback rule:

> However, the Service recognizes, in light of the 2005 final section 411(d)(6) regulations, the plan *should not be considered as failing to satisfy* [the anti-cutback rule of IRC § 411(d)(6)] as a result of the amendments eliminating the retirees benefit increases, *because the amendments were adopted before the effective date of the final regulations*.

*Id.* (emphasis added). We can logically deduce from this declaration that the IRS did not consider the post-retirement COLA an "accrued benefit" under the 2002 Regulation, which was unquestionably applicable prior to August 12, 2005. This position is diametrically opposed to Treasury's proffered interpretation in *Sheet Metal Workers'*. Because Treasury has abandoned the litigation position it took in that case, the Court is

---

[13]The letter was sent pursuant to IRS's 5500 Series Examination, an agency audit procedure to which pension benefit plans covered by ERISA are subject, to determine compliance with the Internal Revenue Code and with the terms of the plan document. Internal Revenue Service, Pt. 4 Examining Process, Ch. 71, Employees Plans Examination of Returns, S. 1. Overview of Form 5500 Examination Procedures, Examination of Objectives and Development of Issues, http://www.irs.gov/irm/part4/ch49s01.html#d0e583219.

relieved of any obligation to defer to it under *Auer*. *Cf. Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991) (holding that a "longstanding" agency interpretation was no longer entitled to *Chevron* deference given that the agency had changed its position on the issue).

*3. Pattern Regulation - 26 C.F.R. § 1.411(d)-4 Q & A1(c)(1)*

Thornton argues that the Plan's prior history of benefits increases established a pattern of plan amendments, which gave rise to a reasonable expectation that the 1999 Benefits Increase was an ongoing plan benefit. Accordingly, he argues the 1999 Benefits Increase was a permanent, non-forfeitable feature of the Plan, pursuant to Treasury regulation 26 C.F.R. § 1.411(d)-4, Q & A-1(c)(1) ["Pattern Regulation"], whose rescission violated the anti-cutback rule.

The Pattern Regulation extends the scope of the anti-cutback rule of IRC § 411(d)(6) by applying the provision to certain benefits, which by the terms of the plan are only available for a limited period of time. *See* 26 C.F.R. § 1.411(d)-4, Q & A-1(c)(1).[14] After affirming that the anti-cutback rule generally protects benefits provided under the terms of the plan, the Pattern Regulation relevantly states:

> if an employer establishes a pattern of repeated plan amendments providing for similar benefits in similar situations for substantially consecutive, limited periods of time, such benefits will be treated as provided under the terms of the plan, without regard to the limited periods of time, to the extent necessary to carry out the purposes of [the anti-cutback rule].

*Id.* The purpose of the Pattern Regulation is to prevent a pension plan's circumvention of the anti-cutback rule through the adoption of repeated plan amendments that offer benefits for only a limited period of time rather than as a permanent feature of the plan. *See* Treasury Dept. Rev. Rul. 92-66. It protects a participant's "reasonable expectation" that the benefit was "an ongoing plan feature and therefore a valuable right under the

---

[14]26 C.F.R. § 1.411(d)-4 is "a formal regulation with the procedural history necessary to take on the force of law." *Central Laborers'*, 541 U.S. at 748. Therefore, § 1.411(d)-4, Q & A-1(c)(1) is entitled to *Chevron* deference if applicable.

plan" due to the "pattern of amendments" created by the recurring amendments. *Id.* Whether a "pattern" exists is a question of fact that depends on the circumstances surrounding the amendments at issue. *Id.*[15]

Thornton claims the Plan established a cognizable "pattern" of amendments through the three amendments granting annual benefits increases to all participants in 1997, 1998, and 1999, such that it created a "reasonable expectation" that the latest increase in 1999 was a permanent feature of the plan and unrevokable under the Pattern Regulation. Thornton seeks discovery of the circumstances surrounding those increases, as requested in his Rule 56(f) affidavit submitted to the lower court, to demonstrate that a "pattern" existed under the factors enumerated in Treasury Dept. Rev. Rul. 92-66.[16]

The flaw in Thornton's Pattern Regulation argument is that it assumes the very principle he seeks to establish in this case— that the anti-cutback rule protects pension benefits granted after a plan participant has permanently separated from covered employment. To the extent the Court disagrees with this proposition, increases in benefits occurring after Thornton's retirement in 1995 are immaterial as they were not expressed in the Plan Document (effective October 1, 1994) existing at the time he retired. Thus, no cognizable "pattern" of increases could arise under the regulation. If, on the other hand, the Court found the anti-cutback rule protected post-retirement benefits, then we would be compelled to reverse the district court's award of summary judgment on that principle alone, rendering moot the discovery requests made by

---

[15]"Whether the recurrence of plan amendments constitutes a pattern of amendments within the meaning of [26 C.F.R. §] 1.411(d)-4 of the regulations is determined on the basis of the facts and circumstances. Although no one particular fact is determinative, relevant factors include: (i) whether the amendments are made on account of a specific business event or condition; (ii) the degree to which the amendment relates to the event or condition; and (iii) whether the event or condition is temporary or discrete or whether it is a permanent aspect of the employer's business." Treasury Dept. Rev. Rul. 92-66.

[16]Although Thornton raised this argument in the lower court, the issue was not discussed in the opinion granting Defendants' motion for summary judgment. *Thornton*, 2008 WL 474416.

Thornton in his Rule 56(f) affidavit. Given that Thornton's Pattern Regulation argument lacks independent force, we need not consider it any further.[17]

*4. Summary*

None of the Treasury regulations interpreting the statutory definition of "accrued benefit" and the anti-cutback rule are dispositive of the issue we confront involving a post-retirement increase in benefits. Although the 2005 Regulation addresses this question, it does not apply to the case at bar because the Plan's December 2002 Amendment occurred before the August 12, 2005 effective date of the regulation. While the 2002 Regulation was in effect at the time of the December 2002 Amendment, it does not establish that "non-ancillary" benefits are necessarily "accrued." Furthermore, Treasury's litigation position in *Sheet Metal Workers'* is not the controlling agency interpretation of the 2002 Regulation given Treasury's recent departure from that position, as reflected by the IRS letter sent to JPT in December 2008. Finally, the Pattern Regulation argument posed by Thornton does not independently establish the Plan's 1999 Benefits Increase was protected by the anti-cutback rule, because it assumes in circular fashion that post-retirement increases fall under the scope of the rule. Given that none of the regulations control the instant dispute, they obviously could not be accorded *Chevron* deference even if the statute is ambiguous.

---

[17]Thornton argues in his Reply Brief that even if the Court found that post-1995 increases in benefits did not establish a "pattern" under 26 C.F.R. § 1.411(d)-4, Q & A-1(c)(1), a "pattern" nonetheless arose through Plan benefit increases implemented prior to 1995. Although Defendants concede that Plan benefits were increased in 1972, 1980, 1982, 1983, 1986, 1988, 1989, the Pattern Regulation states that "patterns or repeated plan amendments adopted and effective *before July 11, 1988 will be disregarded* in determining whether such amendments have created an ongoing optional form of benefit under the plan" 26 C.F.R. § 1.411(d)-4, Q & A-1(c)(2) (emphasis added). Thornton's argument thus boils down to the untenable proposition that the Plan's lone increase of benefits in 1989 established a "pattern" of benefit increases such that the Plan's later rescission of the 1999 Benefits Increase, which was adopted ten years after the 1989 increase, violated the anti-cutback rule. We find this argument to be without merit as a matter of law.

**C. Other Agency Authority–*Mead* Deference**

The agency deference analysis in this case does not end with *Chevron* consideration of Treasury's regulations, and agency interpretations thereof. We also review less formal agency authorities, lacking the "force of law" of notice and comment rule-making, which may be relevant. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Although *Chevron* deference does not apply to these "other" agency interpretations, they still enjoy "some deference whatever its form" due to the agency's institutional expertise and in the interests of judicial uniformity. *Id.* at 226-27, 234-35. The weight of deference accorded depends on the agency authority's inherent persuasiveness. *See id.* at 228. Specifically, we consider "the thoroughness evident in [the agency authority's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 643 (6th Cir. 2004) (observing that *Skidmore* and its progeny "permit[] an agency to earn the weight given to it by the courts, while *Chevron* gives reasonable agency interpretations controlling weight as a matter of right").

On February 23, 2004, Defendants submitted the Plan Document (effective April 1, 2004) to the IRS for a tax-exempt status determination. The accompanying letter emphasized that the Plan was amended to eliminate the 1999 Benefits Increase for pre-February 1, 1999 retirees pursuant to the Board resolution adopted December 6, 2002. The IRS responded in a letter dated May 2, 2005, and granted the Plan tax-exempt status ["2005 IRS Determination letter"]. As mentioned earlier, a pension plan that violates the anti-cutback rule is not entitled to tax-exempt status. *See* I.R.C. § 411(d)(6). In light of this condition, Defendants argue that IRS's decision to grant tax-exempt status for the 2004 Plan, which reflected the December 2002 Amendment, demonstrates that Treasury believed the amendment did not reduce pre-February 1, 1999 retirees' "accrued benefits" and thus, did not violate the anti-cutback rule. Although not expressly referring to *Mead*

deference, Defendants suggest the Court can affirm the district court's award of summary judgment in their favor by relying on the IRS's Determination letter.

The 2005 IRS Determination letter does not carry any weight under *Mead* for primarily two reasons. First, it is not clear that Treasury in fact endorsed the December 2002 Amendment in light of the anti-cutback rule. The letter merely provides a summary conclusion regarding the Plan's tax-exempt status and does not make any specific findings regarding the anti-cutback rule. *See Hickey*, 980 F.2d at 469 (citing "the informal nature of [IRS determination] letters, the express limitations included in the IRS letter, and the absence of any reasoning" in refusing to accord a favorable IRS tax-exempt status determination letter any weight in interpreting the anti-cutback rule). Second, even if we assume Treasury found that the December 2002 Amendment complied with the anti-cutback rule, the absence of a rationale explaining how the agency arrived at this conclusion militates against granting deference under *Mead*. *See* 533 U.S. at 228. Thus, the IRS Determination letter lacks the "power to persuade" this Court in our construction of the statutory definition of "accrued benefit" and the corresponding scope of the anti-cutback rule.

**D.  Conclusion**

Given that none of the Treasury regulations identified by Thornton establish that post-retirement benefits are "accrued benefits" and the IRS Determination letter introduced by Defendants does not warrant deference under *Mead*, the Court stands free to construe de novo the statutory definition of "accrued benefits." For the reasons stated above, we hold a post-retirement increase in benefits is not an "accrued benefit" for a given participant under IRC § 411(a)(7)(A)(i) if not provided for in the terms of the plan(s) existing when the participant engaged in covered employment. Consequently, we find the 1999 Benefits Increase provided by the Plan to pre-February 1, 1999 retirees was not an "accrued benefit" under IRC § 411(a)(7)(A)(i) and thus did not fall under the protection of the anti-cutback rule.

**IV.**

Under ERISA, pension plan administrators serve as fiduciaries of the plan's participants. *See* 29 U.S.C. § 1104(a). In Count Two of his Complaint, Thornton alleged the Plan's Board of Trustees ("Board") violated its fiduciary duty by acting in a manner contrary to ERISA by allegedly running afoul of the anti-cutback rule.[18]

The Board argues as a threshold matter that Thornton cannot pursue a breach of fiduciary duty claim against the Board because it is "nothing more than a repackaged denial of benefits claim." Specifically, the Board contends Thornton should not be able to seek relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (2006), to remedy his breach of fiduciary duty claim while simultaneously requesting a remedy for the violation of the anti-cutback rule under ERISA § 502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B) (2006).

Section 1132(a)(1)(B) permits a pension plan participant to file a civil action under ERISA to recover benefits owed, enforce rights, or clarify rights to future benefits under the pension plan. In contrast, § 1132(a)(3) authorizes suits by participants, among others, to enjoin violations of ERISA and obtain other appropriate equitable relief.[19] A § 1132(a)(3) claim can only be brought simultaneously with a § 1132(a)(1)(B) claim

---

[18]Thornton also alleges that the Board breached its fiduciary duty by favoring one class of Plan participants over another class, specifically by eliminating the 1999 Benefits Increase for pre-February 1, 1999 retirees while maintaining it for Plan participants retiring on or after that date. Thornton waived this argument on appeal, however, by waiting until his reply brief to address the issue, rather than raising it first in his opening brief. *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993) (holding "[i]ssues raised for the first time in a reply brief are not properly before this court").

[19]29 U.S.C. § 1132(a) states in relevant part:
   A civil action may be brought --

      (1) by a participant or beneficiary --
         . . .
         (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
   . . .
   (3) by a participant [or] beneficiary . . . (A) to enjoin any act or practice which violates any provision of this subchapter [relating to "Protection of Employee Benefit Rights" under ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [the "Protection of Employee Benefit Rights"] subchapter or the terms of the plan.

when § 1132(a)(1)(B) cannot "provide an adequate remedy for the alleged injury to the plaintiffs caused by the breach of fiduciary duties." *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 840 (6th Cir. 2007).

In his Complaint, Thornton seeks monetary relief for benefits allegedly withheld in violation of ERISA and resumption of future payments for himself and prospective class members. He also seeks an injunction to prohibit the Board "from eliminating in the future any retiree accrued benefits" and requests a reformation of Section 4.8 of the Plan Document that states retiree benefits increases are not "accrued benefits" under IRC § 411(d)(6) and, consequently, not subject to the anti-cutback rule. As apparent from his Complaint, Thornton seeks plan-wide injunctive relief in addition to monetary damages. Only an injunction pursuant to § 1132(a)(3) will provide the complete relief sought by Thornton, specifically to prevent the Board from amending the plan in the future to eliminate any post-retirement benefits increases. Because a participant may employ § 1132(a)(3) to obtain plan-wide injunctive relief when pursuing more than individual payments, see *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 718 (6th Cir. 2007), Thornton was not precluded from raising his breach of fiduciary duty claim against the Board.

As mentioned above, Thornton contends the Board violated its fiduciary duty by acting in a manner contrary to ERISA. *See* 29 U.S.C. § 1104(a)(1)(D).[20] This basis of relief is derivative of Thornton's primary claim, discussed *supra* in Part III, that the rescission of the 1999 Benefits Increase for pre-February 1, 1999 retirees violated the IRC § 411(d)(6) anti-cutback rule. As the district court stated, "[i]nsomuch as the Board of Trustee's [sic] rescission of the 9.4 percent increase was not in violation of ERISA, the Board of Trustees cannot be said to have breached their fiduciary duty." *Thornton*, 2008 WL 474416, at *4. We agree and therefore affirm the district court's entry of summary judgment in favor of the Board on Thornton's breach of fiduciary duty claim.

---

[20]ERISA requires a fiduciary, in relevant part, to discharge his or her duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter." 29 U.S.C. § 1104(a)(1)(D).

**V.**

Thornton finally claims the district court erred by denying his Rule 56(f) discovery requests. A district court may grant a continuance for discovery while a motion for summary judgment is pending if the party opposing the motion shows by affidavit that it cannot present facts essential to justify its opposition. Fed. R. Civ. P. 56(f). We review a district court's ruling on this motion for abuse of discretion. *See Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196 (6th Cir. 1995). A district court generally does not abuse its discretion in denying a Rule 56(f) discovery request if granting the desired discovery would not have affected its ruling. *See id.* at 1197; *see also Gordon v. Barnes Pumps, Inc.*, 999 F.2d 133, 138 (6th Cir.1993) (finding district court did not abuse its discretion in denying discovery when the "vague allegations" underlying appellant's discovery requests made in opposition to summary judgment would "not change the outcome of the case").

In his opposition to Defendants' motion to dismiss, or in the alternative, for summary judgment, Thornton filed a Rule 56(f) affidavit and requested discovery of several factual matters relating to the December 2002 amendment of the Plan rescinding the 1999 Benefits Increase. He also sought information related to the other post-retirement benefit increases he received in 1997 and 1998. He argues discovery would reveal evidence demonstrating a material issue of fact that would justify denial of Defendants' summary judgment motion. But as the district court correctly found:

> because the determination as to whether the [1999 Benefits Increase] was an "accrued benefit" is made with reference to the Plan terms in effect at the time of Thornton's retirement, any amendments or benefit increases issued or received after his retirement are immaterial. The Defendants have proffered the terms of the Plan in effect during Thornton's employment. Thus, discovery relating to additional documents issued after his retirement is not necessary.

*Thornton*, 2008 WL 474416, at *4 (internal citation omitted). We agree with the district court's conclusion that Thornton's desired discovery would not affect the outcome of

this case.  Therefore, we find the district court did not abuse its discretion in denying Thornton's Rule 56(f) motion.

## VI.

For the foregoing reasons, we **AFFIRM** the district court's decision to grant summary judgment in favor of Defendants and **AFFIRM** its decision to deny Thornton's motion for discovery.